UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN BEAR, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| JEFF MASON and THE UNIVERSITY OF | ) | Jury Trial Demanded |
| CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, John Bear ("Coach Bear"), by his attorneys, Golan Christie Taglia LLP, hereby files this Complaint against Defendants, Jeff Mason ("Mason") and the University of Chicago (the "U of C"), and states as follows:

## PARTIES

1.      Coach Bear is an individual residing in Lombard, Illinois.

2.      Mason is an individual residing in Indianapolis, Indiana. Upon information and belief, Mason transacts business regularly in Chicago, Illinois.

3.      The U of C is a private university in Chicago, Illinois.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over Count I under the express provisions of Title VII, § 2000e-5(f)(3) and 28 U.S.C. § 1331.

5.      This Court has supplemental jurisdiction over Counts II through VI under 28 U.S.C. §1367 as the allegations in Counts II through VI are so related to the claims in the other counts that they form part of the same case or controversy.

6. Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. §1391, because all the significant events giving rise to the claims occurred in this judicial district.

7. Venue is also proper in the Northern District of Illinois, Eastern Division because Defendant does business and has employees located within this judicial district.

## FACTUAL ALLEGATIONS

### *Employment with the U of C*

8. Coach Bear was hired by the U of C in June 2016 as an assistant football coach.

9. When being recruited for the position, Coach Bear was told by the U of C's head football coach, Chris Wilkerson ("Wilkerson"), that the U of C had a strong athletic department and that he had the support of an "up and coming athletic director."

10. Wilkerson made multiple statements to Coach Bear regarding the U of C's commitment to excellence and desire to have a winning football team to entice him to work at the U of C.

11. For example, Wilkerson told Coach Bear that the football team was focused on winning and that the job would give his career upward momentum, one day propelling him to be a head coach.

12. After Coach Bear began working at the U of C, he realized that the female Athletic Director, Erin McDermott ("McDermott"), had little interest in either treating male coaches fairly or building a strong football team.

13. The U of C has a pattern of treating male coaches differently than female coaches. For example, there was a loud verbal incident in the 2015-2016 school year with a female coach, Amy Reifert, which resulted in a policy change and not a termination of her employment.

2

### *Excessive tailgates*

14. While the U of C had little interest in supporting the football team, they did have a vested interest in profiting off the football team.

15. To that end, McDermott would direct tables and tents to be set out around the football field and specifically on 56th Street and its surrounding sidewalks and then allowing unrestricted alcohol consumption by the students, alumni, and students' parents that would attend the games. 56th Street is in the Hyde Park neighborhood of Chicago.

16. At these tailgates, excessive drinking by students, alumni, and parents of students occurred.

17. The excessive drinking led to dangerous incidents. For example, on one occasion, some of the students' parents began shouting racial slurs at some of the other parents and a fight almost broke out.

18. Despite the unruliness and trespassing that occurred, the U of C refused to staff any security at the tailgates in order to maintain order.

19. On multiple occasions, the football coaching staff expressed concerns about the danger that the tailgates threatened, but McDermott, on behalf of the U of C, failed to take any action or have any security measures in place at football games.

### *Mason's history with the U of C*

20. Mason is a parent of one of the students at the U of C.

21. Upon information and belief, Mason had a long history of disruptive behavior during tail gates at the U of C campus in Chicago.

22. Upon information and belief, such behavior included excessive drinking, personal insults, and complaints and threats against the coaching staff for refusing to allow his son to play

more during games.

23. Mason would regularly email other parents of students and express frustration and disappointment with the football coaching staff.

24. Mason made repeated complaints throughout the 2016 football season to other parents regarding both Coach Bear and the other members of the coaching staff, blaming the team's inability to win every game on poor coaching and their refusal to play Mason's son more often.

25. Upon information and belief, some of the students' parents began avoiding Mason given his tendency to get drunk and unruly at tailgates and engage in derogatory treatment of the football coaching staff.

26. Wilkerson, Coach Bear, and other members of the football coaching staff discussed their concerns and frustrations with Mason repeatedly and made the issue known to McDermott and the U of C.

27. Upon information and belief, the U of C was aware that Mason was a threat to the safety of the football coaching staff and but took no remedial action to end the risk.

### *The Incident*

28. On November 12, 2016, the U of C men's football team played a game against Washington University's team.

29. Prior to this game, McDermott, an authorized agent of the U of C, had set up a tailgate on 56th Street. Mason attended the tailgate.

30. Upon information and belief, Mason drank excessive amounts of alcohol during the game and became increasingly disorderly. He did not return to the game after the second half but elected to stay at the tailgate and continue drinking.

31. After the game, Coach Bear was in a restricted section of the stadium with other coaches, players, and members of his family.

32. Upon information and belief, after the game, Mr. Mason was drunk and shouting belligerently at U of C employees to be let into the stadium.

33. Upon information and belief, as there was no security at the football game, Mason was able to force his way into this restricted section.

34. Mason approached Coach Bear, violently grabbed him by the wrist, spun Coach Bear towards himself and then began shouting at Coach Bear.

35. During the assault and battery of Coach Bear, Mason shouted the following:

    a. "How dare you show sportsmanship to the other team!"

    b. "You don't care about the players!"

    c. "You don't care about the football team's concussion protocol!"

36. Coach Bear verbally defended himself from Mason's remarks, while reasonably believing he was being attacked and assaulted by Mason.

37. Coach Bear then left the area and returned to his office.

38. Coach Bear waited in his office for over an hour, assuming that someone from the athletic department would speak to him about the incident.

39. Wilkerson reached out to Coach Bear to question what happened. During that conversation, Wilkerson told Coach Bear that he had done a great job all season and that he loved working with him.

40. As no one else from the U of C reached out to Coach Bear while he was in his office after the game, Coach Bear went home.

41. On November 14, 2016, the U of C acting through McDermott told Coach Bear

that he was being placed on "investigative suspension."

42. During the course of the "investigation," another parent of a U of C student sent an email to McDermott in which he outlined the long, violent history of Mason's behavior at football games and his history of harassing other parents, students, and football coaches. A copy of this email is attached as **Exhibit A**.

43. Other parents and coaches also voiced support for Coach Bear, acknowledging that Mason assaulted and grabbed him.

44. Despite this support, McDermott told Coach Bear that he could either resign his position with the U of C or else have his position terminated. Coach Bear elected to resign under duress and to protect his effort to find other employment.

## COUNT I
### Violation of Title VII of the Civil Rights Act of 1964
### (U of C)

45. Coach Bear incorporates paragraphs 1 through 44 as though fully stated here.

46. At all times material to this Complaint, the U of C was an employer within the meaning of Title VII, §2000e, and employed more than the statutory minimum of fifteen employees.

47. By terminating Coach Bear's employment, the U of C discriminated against Coach Bear on the basis of his gender, male, in violation of §2000e-2.

48. Similarly situated, female coaches, like Amy Reifert, and other employees at the U of C did not receive the same treatment as Coach Bear when involved in altercations, disputes, and assaults.

49. The U of C's violations of Coach Bear's rights under Title VII have caused him significant emotional and monetary harm.

50. The U of C's violations of Coach Bear's rights under Title VII were willful.

WHEREFORE, Plaintiff, John Bear, respectfully requests that this Court, after a jury trial, enter judgment in his favor and against Defendant, the University of Chicago, and award damages equal to: (i) all back pay and front pay lost as a result of his termination of employment, including prejudgment interest; (ii) compensatory damages; (iii) attorneys' fees and costs; and (iv) such other and further relief as this Court deems just and necessary.

## COUNT II
### Premises Liability
### (U of C)

51. Plaintiff incorporates Paragraphs 1-44 as if fully stated herein.

52. The U of C encouraged and invited students, alumni, and students' parents onto its campus during home football games.

53. The U of C encouraged and facilitated tailgates in the area surrounding the football stadium and in its immediate control.

54. The U of C had a duty of reasonable care to ensure the safety of the students, employees, alumni, and students' parents after inviting them onto the campus.

55. The U of C should have realized that the tailgates could have an unreasonable risk of harm to the students, alumni, students' parents, and employees.

56. The U of C breached its duty of reasonable care to its invitees and employees like Coach Bear, by allowing and encouraging unruly tailgates with no security where excessive drinking occurred, all of which posed a danger to U of C employees, students, alumni, and students' parents.

57. The U of C also breached its duty of care to its employees and Coach Bear by failing to ensure a safe work environment for its staff.

7

58. As a result of the U of C's breach of its reasonable duty of care, Mason was able to access the restricted area of the football stadium where he assaulted Coach Bear.

59. The U of C was made aware of the danger that Mr. Mason posed to the coaching staff after multiple prior incidents yet did nothing to protect Coach Bear or anyone else on the football coaching staff.

60. As a direct result of these actions, Coach Bear suffered both physical, economic, and emotional damages.

WHEREFORE, Plaintiff, John Bear, respectfully requests that this Court enter an order in his favor and against the University of Chicago in an amount to be proven at a jury trial plus such further relief as this Court deems just and appropriate.

## COUNT III
### Assault
### (Mason)

61. Coach Bear incorporates Paragraphs 1-44 as if fully stated herein.

62. On November 12, 2016, Mason forced his way into a restricted section of the U of C football stadium and began violently screaming and harassing Coach Bear with the intent to harm and/or frighten Coach Bear.

63. Due to Mason's outrageous threatening conduct, Coach Bear reasonably felt that there was an imminent threat of harm.

64. Mason then grabbed Coach Bear's wrist, spun him towards himself, and continued screaming at him. Coach Bear was concerned for his safety.

65. As a direct result of Mason's actions, Coach Bear has suffered physical, economic, and emotional damages.

WHEREFORE, Plaintiff, John Bear, respectfully requests that this Court enter an order in his favor and against Jeff Mason in an amount to be proven at trial, and punitive damages, and grant such further relief as this Court deems just and appropriate.

## COUNT IV
### Battery
### (Mason)

66.    Coach Bear incorporates Paragraphs 1-44 as if fully stated herein.

67.    On November 12, 2016, Mason forced his way into a restricted section of the football stadium and began screaming at Coach Bear.

68.    Mason then violently grabbed Coach Bear's wrist, spun him towards himself, and continued screaming at him.

69.    Mason's grabbing of Coach Bear was unauthorized.

70.    The violent grabbing of Coach Bear's wrist injured Coach Bear both physically and emotionally, and Coach Bear has been damaged as a result.

WHEREFORE, Plaintiff, John Bear, respectfully requests that this Court enter an order in his favor and against Jeff Mason in an amount to be proven at a jury trial, punitive damages, and grant such further relief as this Court deems just and appropriate.

## COUNT V
### Tortious Interference with Business Contracts
### (Mason)

71.    Plaintiff incorporates Paragraphs 1-44 as if fully stated herein.

72.    Coach Bear had a reasonable anticipation of continued career advancement towards becoming a head football coach when he accepted the position of assistant football coach at the U of C.

73. Upon information and belief, Mason was aware of Coach Bear's professional ambitions to become a head coach.

74. Mason had a history of misguided frustration with Coach Bear, as Coach Bear would not allow Mason's son to get more football playing time.

75. As such, Mason began contacting other parents to complain about Coach Bear and other members of the U of C football coaching staff, seeking to have them replaced.

76. On November 12, 2016, Mason violently confronted Coach Bear in an unjustified attempt to embarrass him and hurt his professional reputation and employment with the U of C.

77. Because of this incident, Coach Bear's employment with the U of C was terminated and Coach Bear's chances at becoming a head football coach in the near future have been substantially diminished.

78. Mason's interference with Coach Bear's business prospects was intentional, willful, reckless, and unjustified.

WHEREFORE, Plaintiff, John Bear, respectfully requests that this Court enter an order in his favor and against Jeff Mason in an amount to be proven at a jury trial, punitive damages, and grant such further relief as this Court deems just and appropriate.

## COUNT VI
### Defamation
### (Mason)

79. Plaintiff incorporates Paragraphs 1-44 as if fully stated herein.

80. On November 12, 2016, Mason forced his way into a restricted section of the football stadium and began screaming at Coach Bear.

81.     At the time, Coach Bear was surrounded by other members of the coaching staff, football players, and his family.

82.     In front of multiple witnesses, Mason shouted:

a.    "How dare you show sportsmanship to the other team!"

b.    "You don't care about the players!"

c.    "You don't care about the football team's concussion protocol!"

83.     Mason made these remarks knowing they were false.

84.     Mason made these remarks with the intent of causing Coach Bear embarrassment and harming his professional reputation.

85.     Because of Mason's actions, Coach Bear has suffered damages as his employment with the U of C was terminated.

WHEREFORE, Plaintiff, John Bear, respectfully requests that this Court enter an order in his favor and against Jeff Mason in an amount to be proven at a jury trial plus such further relief as this Court deems just and appropriate.

Dated:  September 8, 2017

Respectfully submitted,
JOHN BEAR


By: /s/ Peter M. Katsaros
    One of his Attorneys

Peter M. Katsaros, Esq.
Brianna L. Golan, Esq.
GOLAN CHRISTIE TAGLIA LLP
70 West Madison Street, Suite 1500
Chicago, Illinois 60602
(312) 263-2300 (main)
pmkatsaros@gct.law
blgolan@gct.law

11